I'm Nick Hornberger. I represent the appellant, Folex. This case is obviously a civil matter. Summary judgment was granted by Judge Reel in the District Court here in Los Angeles. I'm here to argue on behalf of Folex. I want to give you a little background. You have a tough job. You have to keep a lot of facts in mind and a lot of people going back and forth. This is a three-party agreement. To my left hand is a company called LSMRI. It is a mainland Chinese company, People's Republic of China. They, in the past and presently, manufacture titanium golf club heads, which is kind of nice because that saved my game from the old wooden heads. They really weren't much in business doing this until 1996, until a fellow by the name of Chris Fu, Chris and his wife Sally, are here. They live over in Monterey Park. They didn't walk over, but pretty close, and they are Folex. On the right hand side is OTA, O-T-A, and that is a Taiwanese company. That is Republic of China. They don't seem to have problems doing business together, Taiwan and PRC, and they did in this case. They did business. Mr. Fu brought together these two companies, who really weren't doing much at all by that time, and put them together in a three-party agreement, all three of them. Basically, this started in 1996, and in 2000, it was extended to go out to December of 2011, and Mr. Fu, for his services, bring them together. Marketing, he's here in the U.S. As you can probably figure out, most of the golf clubs are bought in the U.S., but they are bought in other places as well. So he brings them together, and they do a three-party agreement. So it's OTA, Folex, LSMRI. I'm sorry, LSMRI. So we were retained, filed in action in 2009, and Judge Manuel ruled that it should have been filed back in 2005, that Mr. Fu on behalf of Folex had actual knowledge that, in fact, he had an action against OTA and LSMRI. That is on page 34 of the brief, the appellant's brief. And I have to pull it out here. I didn't want to completely read it. I'm sorry, what? What was the term of the initial term of the contract? Initial term, I'm not 100 percent sure. It was extended to December 31, 2011. Okay. And it was in 2005 that they sought to breach it? That they stopped paying in mid-2005. It's page 35 and 36 of the appellant's brief. And according to Judge Reel, and I don't want to read the whole thing because it's actually printed out in real large print and everything, but I have no idea what it says. Mr. Hornberg, in 2005, your client's told, well, one, your client realizes, I'm not getting my commissions now. Yes. Told by OTA that it's no longer going to do business with LSMRI, that it's going to return to its previous supplier of golf head clubs, that it's going to maybe change its name, or LSMRI is going to change its name to avoid paying commissions. Your client hires counsel. There's letters, demand letters, threats of litigation. I didn't see anything in the record that showed that he ever got paid in 2005, and I assume he didn't. You're correct. They were disputing that, and they were going back and forth on that. That came up to ---- Well, let me get to my question. Sure. I'm sorry. So your client is now saying you owe me, at a minimum, my commissions for 2005. Right. Exactly. Why didn't he sue at that point? Just focus on the breach of contract claims. I understand, and it's practicality. It's what was happening at the time. They're over in China and in Republic of China, both the defendants, all right? It's obviously expensive to sue to put that whole thing together. But the issue is knowledge, knowledge, knowledge, knowledge. He had knowledge at that point that he had a claim, and he sat on his hands. No. He had a dispute with them, and he came up and addressed it with them, and both of them lied to him. I'm not talking about the fraud claim. Breach of contract claim. What? Breach of contract claims. I'm not talking about your fraud claim. The fraud claim may be something different entirely. Just focus on the breach of contract claims. I am saying, because of their fraudulent concealment, if he's in the middle of this deal, if LSMRI is not going to be in the business of making titanium golf club heads, he's out. That's not my question, though. The issue is he didn't get paid. He didn't get paid. Sue him right there. Yeah. Did he have a breach of contract case at that point in time for those payments that were due? Probably, yes. Okay. All right. But the reason that he didn't sue was because a few months later he was told directly by both parties, and they both lied to him outright. That's your fraud claim, though. Okay. Okay. But the argument was, the argument was that he said, OTA says we're going to do business with a Beijing company, who was originally the person, the group that Mr. Fu dealt with. They originally made the titanium golf club heads. He said, well, you know, my contract ain't too good if they're going to do business with BIM. LSMRI on the other side said, we're not going to be in the business of making it anymore. We're just not going to do it. And that's it. Okay. Where we get to after that is he believes what they say. If either statement is true, one's in writing and one's oral, if either statement is true, he's out. Folex is, you know, they can't force somebody to make titanium golf club heads. They can't force somebody to continue to deal with a company, LSMRI, that they don't want to do business with. So then what it gets back to is he believes them. In 2008, he reads an article, and they're kind of crawling about the fact that he got thrown out. That's a fairly typical deal to toss out a broker. All right. And does some research, files an action in 2009. Hires our law firm, Mr. Reif's law firm. We take depositions. In taking the depositions, we find one of those, as they say in the trial lawyer business, a smoking gun. And it shows the two of them, the two companies, were planning just to cut them out. So we've got a great way to reduce everything. Never knew about that. Never knew about that, Doc. So let me focus on your fraud claim for a second. At the end of 2005, as you said, he's told, this is off. We're not going to do business with each other. Both ways. Okay. Now, he's being told this by two companies that have already cut off his commissions and have acted suspiciously, is the way the defendants argue it. And so the legal issue is, why wouldn't a reasonably prudent person in Folex's position at that point look into this? In fact, one of the letters invites your client to come back and look into this in effect. I don't see any activity in 2006, 2007, until he reads the article in 2008. And, again, the legal issue is, wouldn't a reasonably prudent person in your client's position at least look into this sooner? Well, sure. That makes sense if he's in Monterey Park and they're in Alhambra. Absolutely it makes sense, Judge. It doesn't make sense if you have to go to communist China and deal with the Taiwanese government and deal with the Taiwanese company. He had no inkling they were still doing business together. They made Herculean efforts to hide what they were doing. I took the deposition of the head of the plant, and he said, oh, we don't do business with LSMRI. We do business with Luan Sunrui. Okay. So then we get the charts out there and the financials, and after about two days of going through this, and they're just fighting this tooth and nail. LSMRI goes like that, and Luan Sunrui goes like that. I said, well, do you have the contract with Luan Sunrui? No, we don't really have that. Who are the people that work there? Well, it kind of turns out it's the same folks. They just happen to change the card on the front. That's all. But the question is, focus on your client. Again, the issue is he's a businessman. He's intelligent. Why should he take these two companies at their word? They've already cheated him out of his commissions. They've already breached the contract. Again, a reasonably prudent businessman would have looked into this, not just walked away, right? I guess that's correct for a few months. He has to go to the next point. Do I want to start litigation between these people when both of them are saying, and he has no reason to believe otherwise, both of them are saying, I'm not going to LSMRI anymore. I'm going to the Beijing company. He gets information that that's accurate. That's a breach of your contract with them. The what? That is a breach of your client's contract. Yes, but that calls us filing the lawsuit. They lied. I don't think we can protect people. I mean, one of them is in writing. They absolutely lied. They deceived them. They planned the whole thing. And that's what the discovery tolling and the fraudulent concealment concepts are meant to do, to protect people that are cheated by people like this. They did it. There's nothing to wrap yourself in. Excuse me. When they stopped paying you in 2005, isn't that a breach of the contract? That is a breach of contract at that point in time, yes. Right. And they were discussing it back and forth. He thought he could work it out. I mean, they were working it out. He wasn't going to run in and file a lawsuit immediately. He thought he could work it out with them. And then it gets to the end. I mean, we're literally only five, six months later, literally. And they're talking back and forth, trying to work the thing out. And then in December he goes, I'm out. These people are no longer. December of what year? December of 2005. He is told, he is told, we're going to the company in Beijing to do the titanium golf club. He knows that company. He used to be the broker for them. So then that's the date of the breach. And you didn't file the suit until 2009. So as to the breach of contract claim, that's four years, and there's a two-year statute. No. No. No, Your Honor. He didn't know that they did it. They lied to him. They deceived him in December of 2005. Okay. But that's your fraud claim, right? What? Your fraud claim, which he didn't discover until 2008. Yes, but also the breach of contract claim, too. They continued to do business together. If they had told him, oh, by the way, we're just going to continue to do business together, too bad, he should have sued, absolutely should have sued. They went to great efforts to hide this and deceive him. Great efforts. What is your notion of what a breach of contract is? Aside from the deceit, the deceit is kind of irrelevant. The contract is, I put you guys together, we have this agreement, I'm supposed to get X number percentage of this deal, right? Right. You don't get the X number percentage of the deal. That is a breach of contract, regardless of whether they're lying or not. Because of what he's told, the contract is no good anymore. The two companies are supposedly not doing business together. Of course, that's a lie. They are doing business together. He didn't know that. He doesn't know that they planned the whole thing. He doesn't know that at all. If he knew that they were still continuing to do business together, as they did, just wouldn't change their names. You're saying it wasn't. Your argument is that it, in fact, was not a breach of contract, to your mind, because, or to your client's mind, it wasn't a breach of contract in 2005, because since they weren't doing business, there was no contract to breach. You only were entitled to get paid if they continued to do business. Yes. If it was three ways, that's the way the contract's written. He only gets a person. So only so long as they're dealing with each other do you get your money, your client. Yes, exactly. Okay, I can see that. I mean, it all rolls together with the breach of contract and the fraud, the statute of limitations on fraudulent concealment. Let's not protect people that lie like this. That's not right. It's just not right. It's not good. I've made a career on that. We have to stop people from doing this. They had a three-way contract. So in your agreement, show me where it says you only get a commission so long as they're doing business or whatever the term of the agreement is. This is agency agreement, strictly confidential? I'm sorry, Your Honor, I can't grab that right now. It's in the big packet of stuff I did. But that's my understanding of the agreement, that each of them have to be doing business with each other. OTA and LSMRI have to be doing business with each other. And he's in the middle. He introduced them. He marketed for them. And he thought it was all over. He said, well, first the payments were not being made. You know, there's discussions between them. But you don't run into court tomorrow. And then at the end of December 2005, he said he finds out from them. They go to one in writing and one orally. We're going to use the Beijing company. But what about this, though? You would admit that at the end of December he could have at least sued them for commissions that he hadn't been paid from April to December 2005. Would you agree with that? I would not only agree with it. I would waive any claim for that. Okay. And so you file that lawsuit form, okay? Right. And in lawsuits you get to do discovery. And in 2006, as his lawyer, you take discovery. And lo and behold, you find out they're still doing business together. And you go back to court and amend your complaint because now you want further breach of contract damages because the contract is still in effect. Sure. Right? Right. And you actually could at that point have brought fraud claims. The whole issue is why did he sit on his hands? Again, if you're admitting he absolutely could have filed a lawsuit at the end of 2005, he sat. And I understand we shouldn't sanction fraud. I get that point. But the law also says you can't sit on your hands. A court has to look at what would a reasonably prudent person under the same circumstances do. I come back to the point I asked you earlier. And wouldn't a reasonably prudent person have filed the lawsuit at the end of December of 2005 at a minimum, done some discovery? And he should have discovered this is the argument in 2006. He should have discovered it. It really wasn't that easy to discover. And it wasn't here. It was over there. It was over in communist China. That's where this is going on, by the way. That's where the manufacturing is going on. That's where the Oda people are. And that's where the golf clubs that come to the United States are. That's where it happens. It's not a shock. The whole issue of counsel is what did you know and when did you know it? Okay. And the district court apparently thought that you knew it a lot sooner than you do. Oh, I don't. Your Honor, with all due respect to Judge Reel, if you read the transcript, that's what he's relying on. That's just preposterous. It is preposterous that that portion of the deposition says that Mr. Fu knew that he had a case in mid-2005. There's no timing on it. There's no nothing. That's what he cited. It's on page, I think, 32 to 35. We quoted the whole thing. That's what he cites, and that's just clear air. He just wanted to clear his calendar or something. I just can't. I simply can't. I couldn't believe it when it happened, when he cited that portion of the transcript. I mean, maybe there's a little something here or something there, so on and so forth. But no way does that support that there was clear, actual knowledge of his causes of action against him. No way. It just doesn't. That is not going to be supported. Geez, I had this whole great speech all made up. I brought my wife here and the whole thing, and you guys just ask me questions the whole time. We're trying to get to the bottom of this. So you're saying even though you knew that you weren't getting commissions, you did not know that that was a breach of the contract. And that probably would be or could be a question of fact for the jury, but Judge Rill decided it on summary judgment, right? Right. The jury can look at that and say, well, you know, I think that there's some stuff there, and the statute of limitations has passed. Too bad. But deciding it as a matter of law, it's just phenomenal to me. And what he cited, I can't believe it. I simply could not believe it. As you probably guessed, I'm a trial lawyer and a fact lawyer, and I just was astounded that that quotation would justify saying that my client actually knew of his case at the time. My client really didn't know about the whole case until depositions started to be taken in August of 2010. He didn't know that there was another company slipped in that had Sunray on it and that one went down and the other one went up. They were still hiding at the time of the deposition in 2010. All right. Well, counsel, you're well over your time, so why don't we hear from the other side? Thank you. I figured that's what you said when you wanted to stop me, so I got that. I'll take this over. Okay, good. Thank you. Good morning, Your Honors. May it please the Court, David Kesselman for Otah Precision. Your Honors, we have two points here, and I intend to address the colloquy that you just had with counsel. But first, we do believe that this case was correctly decided and that Judge Reel's decision should be affirmed. Can you lower your voice a little bit? Oh, I'm sorry. Everybody's felt like yelling at us today for some reason. That happened in the last trial I did, and I had to move the microphone away. The facts, let me clarify a couple of points. First of all, there was no three-party contract agreement. In fact, Judge Reel ruled on that, that Otah was not a party to the contract, and, in fact, they did not appeal that point. So that's not before the Court at all. It's also undisputed, as Your Honors just pointed out in the questioning, that plaintiffs stopped receiving its commissions in March or April of 2005. So plaintiff knew at that time that the contract had been breached. Not necessarily. See, that's what I think the argument is, that if, in fact, they weren't profiting from the making of these golf clubs at that time because they weren't making and or selling them, that wouldn't be a breach under the SST-LSMRI agreement. Well, Your Honor, if you look at ER-120, the addendum to the agreement, once the parties had reached a certain threshold of sales, then Folex became the exclusive agent in the United States for LSMRI. And, in fact, they had reached that. They were their exclusive agent, and that's why they absolutely understood that they had a breach of contract on the spot in March or April of 2005. And it's more than that. As Your Honors pointed out, Folex actually hired counsel. These are not unsophisticated people. They hired Paul Hastings. They retained counsel. They threatened the other side with multiple letters outlining not just breach of contract but conspiracy and fraud. And they had a face-to-face meeting on June the 30th in 2005 with LSMRI. In that face-to-face meeting, and it's in the record, this is all plaintiff's admissions in his own deposition, plaintiff admitted that he was told straight out there is an under-the-table agreement happening here where LSMRI and OTOP are excluding Folex from the deal. And plaintiff was asked specifically by counsel, well, what did you say to the LSMRI representative, Mr. Sun? Counsel, I think that Judge Fletcher was trying to ask you a question. Oh, I'm sorry. I think you should answer her question. No, go ahead. He was asked specifically what the plaintiff specifically told LSMRI, you need to follow the contract. The LSMRI representative said no. This was then followed by a December 31, 2005 letter after a whole series of letters threatening litigation where the plaintiff was specifically told we are spinning off the titanium company. Fly to China and let's discuss it. We are aware of your commission arrangement. So this was not a situation as plaintiff is trying to describe it where they were just left in the dark and they didn't know or hear that this was being spun off. They were asked to fly out. They chose to sit on their hands and not do it. But go to the end of December. Folex is also told by LSMRI and OTA we're not going to do business any longer. And Mr. Hornberger argues if LSMRI and OTA don't do business together, then Folex doesn't get a commission. Do you agree with that statement? I assume the contract had continued into 2006. If they had done business together, then Folex would have got commissions, correct? Correct. Okay. So without LSMRI and OTA doing business together, there's no commission for Folex. Do you agree with that statement? Well, as far as that goes, yes. Just answer that one. Do you agree with that statement? Yes. Okay. So as Mr. Hornberger argues, how at that point, January 1, 2006, how does Folex know that there's a breach of contract when it's being told there is no contract any longer? They're being lied to. So he couldn't have sued them because of the lie. That's what's being argued. Well, first let me just clarify, Your Honor. Obviously, on this record, we have to assume and infer all facts in your favor. Right. If this actually got litigated, there would be a different version. But it didn't. It was summary judgment. But on that record, Your Honor, if you look at ER-120, the addendum to the agreement, and Mr. Hornberger concedes the contract was to go all the way out until January of 2011. Right. There was an ongoing contract. They were the exclusive agent. There was an ongoing breach. They were aware of that because they're writing this and their counsel is writing this in letters to OTOT and LSMRI all through 2005. No damages, though. You can't. You're right. It's a contract that says it's supposed to be performed until 2011. You can't sue for a specific performance. If you had filed a lawsuit and argued that, you'd come back and say they're not doing business together. There's no damages here. You've got to dismiss the breach of contract. It's really two separate periods of time is what's being argued. When did you tell them that you weren't going to do business anymore? I'm not certain that, well, their allegation is that OTA told the plaintiff they weren't going to do business sometime in December of 2005. That's their assertion. Well, what is your assertion as to when they said that? Well, we never had, OTA never had a contract with LSMRI, and so that portion was never developed. This was an LSMRI and plaintiff contract only. They wanted OTA to be a signatory to that agreement. OTA said no. Plaintiff admits they said no. There is no contract. But at what point do you acknowledge that you told them they weren't going to do business anymore? Well, I'll assume on this record, since that's what we have, that plaintiff is correct for this purpose and that it occurred in December of 2005. But certainly they knew before because as of June 30, 2005, and it even goes earlier, back to November of 2004, where apparently OTA and LSMRI both told Folex, the plaintiff, if you don't bring down your commission, because none of us can make it with your high commission, we're going to cut you out of the deal. There was even talk of a name change then. Plaintiff was aware of it. And respectfully, Your Honors, the key issue from our point of view is when was the plaintiff on inquiry notice? That is the key question. As Justice Mosk said in the No Guard decision, you're going to have allegedly meritorious and allegedly unmeritorious cases that are going to get swept up into the statute of limitations on policy grounds. Well, if they said at the end of December 2005, we're not going to do business together anymore, then they could say, okay, no foul. So when after that should they have inquired as to whether they were still doing business? When should they have hired an investigator? They were already on notice, Your Honor. They were on notice because the breach occurred in March or April of 2005. They had been told that if you don't lower your commission, then we're contemplating a name change. In one of their own letters, Folex, the plaintiff, told OTA, we understand there are people even thinking about changing the name. Don't do it. That was in the June 6, 2005 letter sent by their own counsel to OTA. This is not that the plaintiff was unaware. The plaintiff sat on its rights. It knew. It knew as far back as late 2004 all the way into 2005 that this was a possibility. Well, okay, what do we make of this letter dated December 31, 2005, where it says, due to the national economic system reform, the original industry entity that undertakes the casting of titanium alloy has been spun off from our institute, meaning we're not going to make this, our institute isn't going to make titanium alloy anymore. And then it says beginning in January 1, 2006, LSMRI will no longer be in the position to take orders from OTA for the casting of titanium alloy. Isn't that letter saying we're not in this business anymore, and therefore you don't get commissions anymore? You're not entitled to commissions anymore? I don't think so, Your Honor. I think it's saying we're spinning this off. And what it's saying is come to China. We're aware of your commission relationship, if you keep reading, and let's discuss. The plaintiff has an absolute obligation under the law to engage in investigation. They're not in breach of the contract because the commission is only on things that are sold. So they're not in breach of the contract if they're not making the product. But, Your Honor, they were aware going back all the way to November of 2004, and they specifically had a face-to-face discussion June 30, 2005, in which LSMRI's representatives told them. Is that an undisputed fact? It is, and it's in the record. I'll give you the site in one moment. It came out of the plaintiff's own deposition testimony, where Director Sun of LSMRI, in a June 30, 2005, meeting, told the plaintiff, Mr. Fu, face-to-face, there's an agreement in place between OTOT and LSMRI to exclude you. That's at ER 184 through. Well, I'm looking for it in Judge Rios' findings of that. Hold the judge right here a minute. Yes, if you look at ER 56 and then paragraph 20, on June 30, 2005, he was personally told by an officer of co-defendant LSMRI that LSMRI and OTOT had reached an agreement to wrongfully exclude Folex from receiving commissions. He viewed this as a conspiracy. Mr. Fu testified that he viewed this as a conspiracy between LSMRI and OTOT. So he knew as far back as June 2005 that they were going to exclude him, and he knew as far back as November of 2004 they were contemplating a name change to exclude him if he wouldn't reduce his commission percentage. So you have a plaintiff who sat on his rights. I can't explain why. He doesn't really explain why, but he did, and the law is clear. Once the plaintiff is on inquiry notice and has suspicion, once the plaintiff knows that there's been wrongdoing, the fact that the plaintiff may not know every specific fact, that's not a basis to toll the statute of limitations. What's the supplemental sue declaration that the judge is citing to you here? That is an attorney in our office, and he's referencing deposition testimony of Mr. Fu and the letter that triggered the questioning. And these portions have been included in the record here, Your Honor. That's the portions I was referencing at ER 184 through ER 187. And at ER 186, Mr. Fu concedes that that's why he called this a conspiracy. So how do we know that this is an undisputed fact? Because Fu's deposition testimony taken now says that. Well, Mr. Fu makes the admission no one, to my knowledge, has tried on their side to contradict their own officer's testimony on this fact. We certainly did not. And LSMRI was never a party in the case and was never deposed. So all we have is Mr. Fu's representation of what took place. Okay. To Your Honors, I don't know if you want me to address the attorney fee issue, or if you prefer a... Well, you've adequately breathed it in. Okay. If there are no other questions, then I would simply wrap up and reiterate that what we have here is not the usual case where there could be even a remote question that a plaintiff... This is not the case where you have a real estate transaction where the party was unaware that it was taking place, a secret agreement. This is not the April Enterprises case where tape was destroyed, where the plaintiff did not know. The plaintiff was told repeatedly that we're talking about spinning this off. The plaintiff was told directly that we're talking about excluding you. The plaintiff's own commissions stopped. The plaintiff hires counsel, speaks to multiple counsel, including Paul Hastings. Are you going to argue the whole thing all over again? I'm sorry. I think we're through this. It's our contention that Judge Brewer's ruling should stand. Okay. Thank you, counsel. Thank you. Are we agreed? Yes. Thank you. There's obviously many factual disputes on what people said and what they meant and what they understood. There was no business in Judge Brewer granting this under-judgment, saying that this wasn't even a close call and it's a matter of law. We presented lots of evidence from Mr. Fu, and he didn't know about this surreptitious relationship. He didn't know that they lied. He wasn't going to file a lawsuit over nothing. There's nothing forcing OTA and LSMRI to do business. He thought they weren't doing business. But did he controvert these facts that are in paragraph 20? I'm sorry. Did he what? Controvert the facts in paragraph 20. Are they in dispute or not? Okay. That's good. Thank you. What was he conscious, and what he said forward was, I was having disputes with them. I was going back and forth with them. This is not the end-all, be-all. And when it gets to the end of the year, he's basically told, Guys, we're not going to do business anymore. OTA and LSMRI are not going to do business anymore. And he backed off because they had to do business or there wouldn't have been any damages. It's as simple as that. There wouldn't have been any damages. This is a two-fold thing. The middle of 2005, like a lot of business deals, people go back and forth. They discuss it back and forth. He doesn't know that they're in dispute. He doesn't know that they continue business. How is he going to know in the middle of 2005 that they continue to do business surreptitiously from 2006 on? They did it. They changed names. They hid it. But the argument is he was put on inquiry notice. As a matter of law, as Judge Fletcher asked, when should he ñ when should your client have hired an investigator? When should he have inquired? Under these undisputed facts, he was put on inquiry notice back in 2005, and he sat on his hands. And at the end of 2005, he was told it's all over because we're no longer doing business, and that's what it appeared happened, that they were no longer doing business. Okay. That's what it appeared. And these are factual questions that have to be decided, not by a judge, but by a prior fact. And trust me, it will be approved. Please send this back. Please overrule Judge Leo and let me talk to him. All right. Thank you, counsel. Folek Sculpt Industries v. Ota Precision Industries will be submitted, and the session of the Court is adjourned for today. Thank you. Thank you. All rise.
judges: Mendez, Fletcher, Wardlaw